1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                       EASTERN DISTRICT OF CALIFORNIA

10

ANGELA L. VASQUEZ,                    )   1:11-cv-00853-SKO
11                                     )
                                       )   **ORDER REGARDING PLAINTIFF'S**
12             Plaintiff,              )   **SOCIAL SECURITY COMPLAINT**
                                       )
13        v.                           )   (Docket No. 1)
                                       )
14   MICHAEL J. ASTRUE,                )
     Commissioner of Social Security,  )
15                                     )
                                       )
16             Defendant.              )
                                       )
17   _____ )

18

19                          **I.  BACKGROUND**

20        Plaintiff Angela L. Vasquez ("Plaintiff") seeks judicial review of a final decision of the

21   Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for

22   Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles

23   II and XVI of the Social Security Act (the "Act").  42 U.S.C. §§ 405(g), 1383(c)(3).  The matter is

24   currently before the Court on the parties' briefs, which were submitted, without oral argument, to

25   the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

26   _____

27        [1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 10, 11.)  *See* 28 U.S.C.
     § 636(c); Fed. R. Civ. P. 73; *see also* Local Rules of the United States District Court, Eastern District of California 301,
28   305.

## II.  FACTUAL BACKGROUND

Plaintiff was born in 1965, completed two years of college, has an associate science degree, and previously worked as a respiratory therapist.  (Administrative Record ("AR") 34, 76, 189, 194, 197, 233.)  On November 27, 2007, and December 18, 2007, respectively, Plaintiff filed applications for SSI and DIB, alleging disability beginning on September 2, 2004, due to bipolar disorder, depression, and adult attention deficit disorder.  (AR 67-84.)

A.    **Relevant Medical Evidence**

The earliest medical evidence in the record indicates that Plaintiff was seen by Wen Liang Chu, M.D., at Community Behavioral Health Center/Fresno Mental Health ("Fresno Mental Health") on December 14, 2004.  (AR 284.)  Dr. Chu noted that Plaintiff was being seen for a follow-up visit after having a panic attack, where she had palpitations, was anxious, could not sleep, and had crying spells.  (AR 284.)  Plaintiff had been clean from methamphetamine use for two months, since October 2004, and would be living with her mother after leaving drug rehabilitation.  Dr. Chu found Plaintiff to be fidgety, but her speech was coherent and goal-oriented and she stated that she had better concentration.  (AR 284.)  Plaintiff was seen again at Community Behavioral Health Center on January 7, 2005, by Ramon Q. Raypon, M.D., and on January 13, 2005, by Dr. Chu.  (AR 282-83.)

On April 5, 2005, the staff at Fresno Mental Health requested that Dr. Chu see Plaintiff because she was "agitated and angry" at her ex-boyfriend.  (AR 281.)  Plaintiff had been "off" her medication for three days.  (AR 281.)  Dr. Chu directed Plaintiff to restart the medication and participate more often in her group therapy sessions.  (AR 281.)  On April 28, 2005, Dr. Chu indicated that Plaintiff was taking her medication "but not everyday" and was "feeling no improvement."  (AR 280.)  However, Dr. Chu noted that Plaintiff was "calmer" and able to "focus on [the] conversation."  (AR 280.)  Plaintiff denied recent drug use.  (AR 280.)

On May 3, 2005, Plaintiff was admitted to Community Medical Center "on a 5150 due to strong suicidal ideations."  (AR 249.)  Plaintiff was diagnosed with depressive disorder not otherwise specified ("NOS"), anxiety disorder NOS, adjustment disorder with mixed depression, anxiety and major depressive disorder, alcohol dependence, and methamphetamine abuse.  (AR 249.)  Plaintiff's

mental status examination on admission indicated that she "reported suicidal thoughts," "felt worthless and hopeless," and "reported auditory hallucinations, mostly derogatory voices telling [her] that she was no good and needed to kill herself." (AR 250.)  Plaintiff's medication was adjusted.  The hospital summary indicates that Plaintiff had "a long history of alcohol dependency and methamphetamine abuse," although Plaintiff "stated that she had been clean and sober for the past few months after she [had] graduated from a drug treatment program." (AR 250.)  However, while in the hospital, Plaintiff informed Surinder P.S. Dhillon, M.D., that she had been "drinking very heavily and ha[d] even been taking some cough medication very heavily." (AR 255.)  Plaintiff indicated that she missed her six-year-old son who was living with his father and feared that she would never see her son again because the father did not allow visitation. (AR 250.)  Plaintiff was discharged from the hospital after two days on May 5, 2005; she was discharged against medical advice because she did "not meet the criteria for 5150 at the time" and could not "be held against her will." (AR 251.)

On May 13, 2005, Plaintiff was readmitted to Community Medical Center on another 5150 hold. (AR 244-45.) Plaintiff reported suicidal ideations and auditory hallucinations. (AR 244.) She was diagnosed with bipolar disorder NOS, polysubstance abuse, and relationship problems.  (AR 245.)  Plaintiff had been staying at the Westcare Rehabilitation program but stated that "she was upset because she wanted a dual diagnosis program instead of a program purely focused on chemical dependency." (AR 244.)  Additionally, Plaintiff was "upset at [her] family for not believing she had been clean and sober, [and] also upset at her ex-husband." (AR 246.) Plaintiff's medication dosages were adjusted and "she continued to make gradual improvement." (AR 244.)  Upon discharge on May 18, 2005, Plaintiff "[s]tated [that] her mood was 'okay.'" (AR 244.)  At discharge, Plaintiff was instructed to continue her medication and to follow up with her mental health care provider; she was also provided referrals to rehabilitation programs.  (AR 245.)

Plaintiff returned to Dr. Chu on May 23, 2005, for samples of Seroquel and Cymbalta, medications that she had run out of two days previously.[2]  (AR 278-79.)  Plaintiff indicated that the medications had been "helping her"; she did not report any side effects.  (AR 278.)

On May 24, 2005, Plaintiff was admitted to the Apollo therapy program.  (AR 276.)  On May 31, 2005, Plaintiff was treated by Sarah Morgan, M.D., who reviewed Plaintiff's medical history and indicated that Plaintiff's hospital admissions had been secondary to "DTs" (delirium tremens),[3] noncompliance with medication, not eating, and taking cough syrup with codeine.  (AR 276.) Plaintiff informed Dr. Morgan that Plaintiff's last drink had been on May 8, 2005, but prior to that it had been one year since she had been drinking.  Plaintiff reported that her last use of methamphetamine was on October 8, 2004, and her last use of cocaine had been more than two years prior. (AR 276.)  Plaintiff indicated that she "feels [her] depression is better" on the medication but that the dosage was "too much."  (AR 276.)  However, she was "still talking fast."  (AR 276.)  Dr. Morgan diagnosed Plaintiff with bipolar disorder NOS and polysubstance dependence in early full remission.  (AR 277.)

Plaintiff was seen by Dr. Morgan between June 9 and July 8, 2005.  (AR 269-71, 273.) Plaintiff indicated that she had been compliant with her medication, denied any side effects, but was having problems sleeping.  (AR 269-71, 273.)  Plaintiff had tried numerous medications and felt that they were working.  (AR 271.)  Her mood was consistently "good."  (AR 269-71, 273.)  On June 14, 2005, Plaintiff reported that she had used methamphetamine "last week."  (AR271.)  On June 24, 2005, although Plaintiff "denie[d] craving currently," she also reported that "meth[amphetamine] was helping her calm down [and] stop the racing thoughts."  (AR 270.)  Dr. Morgan "talked [to Plaintiff] at length about the importance of staying [and] living sober."  (AR 270.)  Plaintiff was seeking to have her own apartment and to gain 50 percent custody of her son.  (AR 269.)

---

[2] Seroquel is the brand name for a preparation of quetiapine fumarate, used to treat schizophrenia and other psychotic disorders.  *Dorland's Illustrated Medical Dictionary* 1590, 1723 (31st ed. 2007) [hereinafter *Dorland's*]. Cymbalta is the brand name for a preparation of duloxetine hydrochloride, used to treat major depressive disorder and for relief of pain in diabetic neuropathy.  *Id.* at 465, 580.

[3] Delirium tremens is defined as alcohol withdrawal.  *Dorland's* at 490.

4

On August 2, 2005, Dr. Morgan indicated that Plaintiff had been compliant with her medication, denied any side effects, and was "ready for discharge" from the Apollo treatment plan. (AR 267.)  Plaintiff was "stable on current medication" and felt that the medication was "helpful." (AR 267.)  Plaintiff's mood was "good," although she was a "little depressed" about her son.  (AR 267.)

Plaintiff returned to Dr. Chu on September 8, 2005.  (AR 265-66.)  Plaintiff indicated that the medication "calmed her down" and she had stopped hearing voices.  (AR 265.)  Plaintiff did not report any side effects to the medication.  (AR 265.)  She was participating in group therapy, and stated that she had been "clean" since October 2004.  (AR 266.)

Plaintiff was seen regularly at Fresno Mental Health from September 2005 through February 2006.  (AR 258-64.)  On October 5, 2005, Plaintiff informed Dr. Chu that she had been clean for four months.  (AR 263.)  Plaintiff's medication helped with her depression, helped her sleep, slowed her down, and allowed her to focus better.  (AR 262-63.)  On February 2, 2006, Plaintiff reported to Dr. Chu that she was attending City College and had no problem with concentration.  (AR 258.) Dr. Chu noted that Plaintiff was "fidgety" but that her mood was "okay."  (AR 258.)

On June 29, 2006, Plaintiff was seen by Dr. Chu.  (AR 304.)  Plaintiff reported that she had been clean for one year and that she was "[p]lanning to attend City College."  (AR 304.) Plaintiff stated that she was still taking her medication as prescribed and agreed to attend group therapy.  (AR 304.)  On August 3, 2006, Plaintiff informed Dr. Chu that she had no recent drug use and that the medication helped her sleep.  (AR 302.)  However, on September 11, 2006, Plaintiff was seen for an unscheduled session by Laura Ballard, LPT; Plaintiff indicated that she was anxious and having trouble sleeping due to an upcoming court date over her son's custody.  (AR 298.)  Plaintiff also admitted that she drank "a lot of caffeinated sodas with lots of sugar" and a "huge thermos of coffee every morning," and agreed that "her daily habits are keeping her awake."  (AR 298.)  Three days later, on September 14, 2006, Dr. Chu noted that Plaintiff still had "anxiety" over the upcoming child custody case and "need[ed] something to calm down."  (AR 300.)  Dr. Chu also noted that Plaintiff had improved on medication, had no side effects, and had been clean for one year.  (AR 300.)  In

October and November 2006, Dr. Chu indicated that Plaintiff's response to medication had improved, that she had no side effects, and that she was "coping well." (AR 296-97.)

Plaintiff's care was transferred from Dr. Chu to Ramon Q. Raypon, M.D., at Fresno Mental Health, and on February 16, 2007, Plaintiff indicated that she was "doing al[l] right but still feeling nervous and anxious going [through a] custody battle with ex-BF [boyfriend] for their child." (AR 291, 293.) Plaintiff reported "benefits with medications to control depression and abil[ity] to sleep." (AR 291.) Dr. Raypon noted that Plaintiff's mood was anxious, but that she had normal thought processes and organization. (AR 291.) Plaintiff reported no side effects of the medication. (AR 291.) Dr. Raypon diagnosed Plaintiff with bipolar disorder NOS and polysubstance dependence in remission. (AR 289.)

On April 3, 2007, Dr. Raypon noted that Plaintiff requested a refill of her medications and that she was "feeling depressed and nervous following [a] mediation hearing for child custody and [was] informed [that] custody [was] to be granted to the father." (AR 289.) Dr. Raypon assessed Plaintiff with restless motor activity and noted that she was "jittery." (AR 289.) Plaintiff indicated that she had "read about [the] side effects to Seroquel like movements," but stated she had those "problems . . . before taking" the medication. (AR 289.) Plaintiff "appear[ed] very nervous and restless" and stated that she "did not sleep well without Seroquel." (AR 289.) On June 8, 2007, Plaintiff informed Dr. Raypon that she was "feeling depressed" because it was a "struggle looking for work" and she was "trying to get custody" of her son. (AR 288.) Dr. Raypon noted that Plaintiff had restless motor activity and was anxious, but the rest of her mental status exam was normal. (AR 288.)

On April 11, 2008, Plaintiff was seen by Shireen R. Damania, M.D., for a psychiatric evaluation. (AR 307-10.) Prior to the examination, Dr. Damania noted that Plaintiff had completed a Disability Report that indicated that Plaintiff stated that she was "not able to perform [her] job due to mood swings," which would range from being "happy" to "then . . . crying." (AR 307.) Dr. Damania reported that Plaintiff was "somewhat jumpy" throughout the exam. (AR 307.) Plaintiff had changed her medication two weeks prior to the visit due to changes in her coverage with Medi-Cal. (AR 307.) Plaintiff "[i]nitially . . . state[d] that she [had been] in counseling on a regular

basis, then towards the end of the interview [with Dr. Damania] she state[d] she had not seen a counselor in six months." (AR 308.) Plaintiff informed Dr. Damania that she was bipolar "because she had 'mood swings'" and stated that when she stops taking her medication she feels as if she is "'dreaming and talking to people who are not there.'" (AR 308.) Plaintiff stated that she had gone on job interviews but was told that she was not hireable. (AR 308.) Upon mental status examination, Dr. Damania found that Plaintiff's "[s]peech was normoproductive and there was no evidence of a speech defect. Mood was anxious. Affect was appropriate to the thought content and situation." (AR 309.) Plaintiff "denied any suicidal or homicidal ideations and impulse control and frustration tolerance were within normal limits." Dr. Damania also found that "[t]here was no evidence of hallucinations or delusions" and "no evidence of a thought disorder." (AR 309.) The diagnostic impression was mood disorder NOS, anxiety disorder NOS, and polysubstance dependence in remission two years by history. (AR 309.) Dr. Damania opined that:

> [Plaintiff] is able to understand, carry out, and remember three- and four step instructions in a work like setting. She would have difficulty with complex and detailed job instructions. She is able to respond appropriately to coworkers, supervisors, and the public. She is able to respond appropriately to dual work situations and deal with changes in a routine work setting with normal supervision.

(AR 309-10.)

Plaintiff was seen by Dr. Raypon on April 3, 2008. Plaintiff reported "feeling depressed and anxious" because she had run out of Cymbalta for over a week as it was "no longer covered by [her] insurance." (AR 330.) Dr. Raypon prescribed a trial of Celexa.[4] (AR 330.)

On May 14, 2008, Robert B. Paxton, M.D., reviewed Plaintiff's medical records and completed a mental residual functional capacity ("RFC")[5] assessment. (AR 311-26.) Dr. Paxton found that Plaintiff was moderately limited in her ability to understand, remember, and carry out

---

[4] Celexa is the brand name for a preparation of citalopram hydrobromide, used as an antidepressant. *Dorland's* at 317, 372.

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

detailed instructions, but had no other significant limitations. (AR 311-12.) Dr. Paxton opined that, "[w]hen sober[,] claimant has the cognitive and concentrative capacity to perform[,] understand and remember simple level tasks and instructions. No adaptive limitations. Able to work in a non public setting. When [not sober,] claimant cannot [perform tasks]." (AR 313.) Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining concentration, persistence, and pace, moderate difficulties in maintaining social functioning, and had one or two repeated episodes of decompensation. (AR 322.)

On May 29, 2008, Plaintiff was seen by Dr. Raypon for a medication visit and reported that she was "doing al[l] right but [was] depressed at times because of [her] life situation." (AR 329.) Plaintiff stated that she was "denied social security [benefits] and want[ed] to get some job training." Plaintiff did not report delusions, hallucinations, or suicidal ideations. (AR 329.) Plaintiff's motor activity was restless, her thought processes organized and coherent, and her mood was anxious. (AR 329.) Plaintiff indicated no side effects to the medication, which she reported as "somewhat" effective. (AR 329.)

On July 29, 2008, Randall J. Garland, Ph.D., performed a complete review of Plaintiff's case file, and affirmed the prior analysis by Dr. Paxton. (AR 340.)

Plaintiff was seen by Dr. Raypon throughout 2008. (AR 389-401.) On July 24, 2008, Plaintiff reported that Celexa was "not working" and she was "feeling depressed when taking it." (AR 401.) The Celexa was discontinued and Plaintiff was prescribed Prozac.[6] (AR 401.) On September 18, 2008, Plaintiff reported that she had no medication for a week because her insurance was discontinued and she was applying for a continuation of coverage. (AR 396.) Plaintiff reported that she was "feeling more nervous, not sleeping, nauseous at times, depressed, [and] hearing voices." (AR 396.) Dr. Raypon found Plaintiff's thought processes to be organized and coherent. (AR 396.) On December 11, 2008, Plaintiff reported that she had "been without medications for over a month [because it] was not covered by insurance and [she] cannot pay for it." (AR 392.)

---

[6] Prozac is the brand name for a preparation of fluoxetine hydrochloride, used to treat depression. *Dorland's* at 730, 1562.

1   Plaintiff stated that she was "getting more nervous, depressed, [and] restless." (AR 392.) She also

2   reported problems concerning her child custody case. (AR 392.)

3       Plaintiff continued to be seen by Fresno Mental Health from January through September

4   2009. Progress notes indicate that Plaintiff reported concerns acquiring her medication because of

5   a "billing complication" and "waiting for Medi[-]Cal approval." (AR 385-86.) On March 5, 2009,

6   Dr. Raypon noted that Plaintiff indicated that she was "doing good on medications [and] calming

7   down." Her thinking was clearer and she was "less anxious and depressed." (AR 378.) She denied

8   any abuse of drugs or alcohol. (AR 378.) On May 28, 2009, Plaintiff reported to Dr. Raypon that

9   she was "doing al[l] right but [that] others told [her she was] nervous, restless[,] talking loud but

10  [that she was] not aware of it." (AR 366.) She reported mood swings and believed that Prozac was

11  not working for her; she requested Cymbalta which had helped her previously. (AR 366.) Dr.

12  Raypon prescribed Cymbalta. (AR 366.) On July 23, 2009, Dr. Raypon noted that Plaintiff was

13  "calming down" and was "less depressed," which may have been related to medications. (AR 359.)

14  Plaintiff also indicated that she was "sleeping more." (AR 359.)

15      On August 8, 2009, Lupe C. Parraz, a licensed clinical social worker, completed an adult

16  comprehensive assessment. (AR 346-51.) Ms. Parraz noted that Plaintiff had been diagnosed with

17  bipolar disorder NOS. Plaintiff reported that "she has mood swings five times a week," and that

18  "when she is depressed she feels unmotivated and has impaired sleep." (AR 346.) Ms. Parraz

19  indicated that, at the time of the assessment, Plaintiff was drinking a bottle of wine three times a

20  week, but had not used opiates or analgesics since 2007. (AR 347.) Plaintiff was well-groomed,

21  cooperative, and engaging, but reported feeling "anxious around a lot of people and has some

22  claustrophobia." (AR 348-49.)

23      A progress note from Fresno Mental Health indicated that on August 20, 2009, Plaintiff was

24  "having trouble getting her med[ication]s refilled" and that she had been "out of med[ication] for

25  three weeks." (AR 355.) The note stated that Plaintiff "had pressured speech" and was having

26  "difficulty staying focused." (AR 355.)

27      On December 3, 2009, Ms. Parraz, completed a psychiatric/psychological medical source

28  statement. (AR 404-06.) Ms. Parraz indicated that she had been treating Plaintiff since April 22,

2008 and that Plaintiff "[h]as difficulty being in public settings," "has racing thoughts," and "cannot stay focus[ed] or maintain importan[t] information." (AR 405.) Ms. Parraz opined that Plaintiff's "mood swings" will "impair [her] abilities to work and her attendance to the job site." (AR 405.)

On February 6, 2010, Plaintiff was seen by Ekriam Michiel, M.D., for a psychiatric evaluation. (AR 409-15.) Plaintiff reported to Dr. Michiel that "[f]ive years ago [she] was also on methamphetamine but stopped in 5/07." (AR 409.) She also reported hearing voices, seeing shadows, and being unable to be around people and crowds. (AR 409.) Plaintiff stated that she "can't focus" and is "always worried." She also reported crying and on "some days" her "mind races." (AR 409.) Upon mental examination, Dr. Michiel found that Plaintiff was "slightly restless," and sat "shaking her legs vigorously and running her hands." (AR 410.) Plaintiff was "oriented to person, place, and date." (AR 410.) Her "mood was 'depressed,'" and her "[a]ffect was intense, anxious." (AR 411.) She denied suicidal or homicidal ideations. (AR 411.) Plaintiff's "[t]hought process was goal-directed. Thought content was not delusional but [she] admitted to being paranoid around people. She admitted to auditory, visual and tactile hallucinations, but there was no evidence of any response to internal stimuli." (AR 411.) Dr. Michiel diagnosed Plaintiff with depressive disorder NOS, anxiety disorder NOS, and amphetamine dependence in sustained full remission by history. (AR 411.) Dr. Michiel opined that:

> [Plaintiff] is able to maintain attention and concentration and to carry out simple repetitive job instructions. The claimant is able to relate and interact with coworkers, supervisors and the general public while performing the limited repetitive job instructions. The claimant is unable to carry out an extensive variety of technical and/or complex instructions.

(AR 411.)

**B.     Administrative Hearing**

The Commissioner denied Plaintiff's applications initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 99-103, 108-15.) On April 26, 2010, ALJ William Wallis held a hearing in which Plaintiff, represented by counsel, and vocational expert ("VE") Tom Dachelet testified. (AR 28-66.)

1.      **Plaintiff's Testimony**

Plaintiff testified that she was 43 years old on the date of the hearing and had earned a two-year associate science degree. (AR 32-34.) Plaintiff had previously worked for 12 years as a respiratory therapist, where she cared for patients with asthmatics, but was not currently working. (AR 34-35.) Plaintiff indicated that she was disabled due to bipolar disorder, depression, and adult attention deficit disorder, and that she would have "psychotic episodes." (AR 36.) Plaintiff stated that she was unable to work because she would get "really nervous and anxious," she was "afraid around people" and being in "public places," and her "mood swings [were] unpredictable." (AR 36-37.) Plaintiff described her mood swings as "erratic," with "racing thoughts," which made her "unable to really sit still [or] concentrate." (AR 37.) Plaintiff would "start talking too fast, fidgeting more, moving around a lot," and would be "unable to sleep." (AR 37.) Plaintiff stated that she would be afraid to go out in public when she was feeling nervous and anxious and that she would go to the grocery store once a month. (AR 37.)

Plaintiff stated that she was no longer using illegal drugs but was on prescription medication, including Cymbalta, Klonopin[7], and Seroquel, and testified that she stopped using "other drugs" in May 2006. (AR 38.) Plaintiff stated that she last drank alcohol "probably around" the same time, but that she never had a problem with alcohol because she "[n]ever really got a taste for it." (AR 38.) Plaintiff said that the programs she had been attending through the "behavioral center" had all been "shut down." (AR 39.) At the time of the hearing, she was seeing Ms. Parraz (a social worker) and attending group counseling twice a week. (AR 39-40.) Plaintiff indicated that her mental conditions caused limitations such as memory problems, concentration problems, anxiety, and paranoia. (AR 41-43.) Plaintiff also had difficulty sleeping. (AR 44.) If Plaintiff was in a "depressive state," it would be "two weeks before [she would] take a shower or bath." (AR 45.) Plaintiff testified that within a one month period, she would experience a depressive state "[p]robably four to five times." (AR 45.) The "shortest" period that a depressive state would last

---

[7] Klonopin is the brand name for a preparation of clonazepam, used to treat panic disorders. *Dorland's* at 379, 1003.

would be three days, and she would also experience three to four "long" episodes in a six-month period.  (AR 45-46.)

Plaintiff was able to cook "simple meals" such as oatmeal, soups, and "chicken in the oven." (AR 46.)  Plaintiff's typical day, if she was not participating in group therapy, was waking up, drinking "a couple of cups of coffee, trying to sit down and watch TV, but [she would] end up wandering around," which would consist of "going around the house" and, if she was in a manic phase, "smok[ing] a lot."  (AR 46.)  Plaintiff would "sometimes . . . try to help do the yard work" and would "try" to help her mother with cleaning and other house work.  (AR 47-48.)  Plaintiff was able to do the laundry and vacuum, as well clean up after herself because she would make "a big mess" when she was depressed.  (AR 48.)  Plaintiff would go food shopping with her mother once a month when she received her food stamps.  (AR 49.)  Plaintiff had no hobbies, but would "try to go" to church on Sundays, where she would "sit in the little side chapel," which had "maybe five people at the most."  (AR 50.)

As for Plaintiff's former drug use, she testified that she was "self-medicating" in the beginning and that she "started using them when [she] was drunk and stuff, they actually helped [her.]" (AR 51.)  She stated that people thought she was "normal" when she was on drugs and that there was "something wrong" with her when she was not using them.  (AR 51.)  She felt that the drugs "actually helped [her] symptoms" and "fixed" her so that she could "go places" and "function." (AR 51.)  Plaintiff was unclear as to when she stopped using drugs because she would get her "dates mixed up."  (AR 52.)  She also indicated that she "never had a problem with alcohol" and could not recall saying that she used to drink alcohol three times a week.  (AR 51-52.)

### 2.   VE Testimony

The VE testified that Plaintiff's former position as a respiratory therapist was medium and skilled.  (AR 60.)  The ALJ asked the VE whether a hypothetical person could perform Plaintiff's past relevant work if that person was of Plaintiff's age, education, language, and work background; had no difficulties in memory, concentration, persistence, or pace; was cooperative with good interpersonal skills; could understand, carry out, and remember three- to four-step job instructions but would have difficulty with complex, detailed job instructions; and could respond appropriately

to usual work situations and deal with changes in the routine work setting with normal supervision. (AR 61-62.)  The VE testified that such a hypothetical person could not perform Plaintiff's past relevant work, but could perform the "full world of unskilled" work, including occupations such as hand packager, inspector-operator, and machine packager.  (AR 62-63.)

The ALJ proposed a second hypothetical where the person had the cognitive and concentrative capacity to perform, understand, and remember simple level tasks and instructions; had no adaptive limitations; and could work in a non-public setting but not in a public setting.  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform the same jobs identified in the first hypothetical, which would require a 50 percent reduction of the number of jobs available due to the "public versus not public" limitation.  (AR 63-64.)

The ALJ's third hypothetical posited a person who could concentrate for at most one hour in an eight-hour workday but not for that entire period; could not interact with the public; could interact minimally with supervisors, minimally being "at least five percent or less of an eight-hour day"; and would have difficulty following oral instructions.  (AR 64-65.)  The VE testified that such a person would be unable to work.  (AR 65.)

## C.    ALJ's Decision

On March 22, 2010, the ALJ issued a decision finding Plaintiff not disabled since September 2, 2004, the alleged onset date of her disability.  (AR 8-21.)  Specifically, the ALJ found that (1) Plaintiff met the insured status requirements of the Act through December 31, 2008; (2) Plaintiff had not engaged in substantial gainful activity since September 2, 2004, the alleged disability onset date; (3) Plaintiff had "severe" impairments of bipolar disorder NOS, polysubstance abuse in reported remission, depressive disorder NOS, and anxiety disorder NOS based on the requirements in the Code of Federal Regulations; (4) Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Plaintiff had the RFC to perform a full range of work at all exertional levels but with the non-exertional limitations of performing, understanding, and remembering simple level tasks and instructions with no adaptive limitations and the ability to work in a non-public setting but not in a public setting; (6) Plaintiff was unable to perform past relevant work; (7) Plaintiff was defined as

a younger individual on the alleged disability onset date; (8) Plaintiff had at least a high school education and was able to communicate in English; (9) the transferability of job skills was not material to the disability determination because Plaintiff was "not disabled" under the Medical-Vocational Rules whether or not Plaintiff had transferrable job skills; (10) there were jobs that exist in significant numbers in the national economy that Plaintiff could perform; and (11) Plaintiff had not been under a disability as defined in the Social Security Act since September 2, 2004, through the date of the decision.  (AR 13-21.)

Plaintiff sought review of this decision before the Appeals Council.  On March 30, 2011, the Appeals Council denied review.  (AR 1-3.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

**D.      Plaintiff's Contentions on Appeal**

On May 25, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff contends that the ALJ erred by improperly rejecting the mental health evidence in the record and Plaintiff's testimony as to the episodic nature of Plaintiff's severe bipolar disorder.  (Doc. 18.)

## III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

1   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

2   may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

3   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

4                              IV.  **APPLICABLE LAW**

5           An individual is considered disabled for purposes of disability benefits if he or she is unable

6   to engage in any substantial, gainful activity by reason of any medically determinable physical or

7   mental impairment that can be expected to result in death or that has lasted, or can be expected to

8   last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

9   1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

10  impairments must result from anatomical, physiological, or psychological abnormalities that are

11  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

12  such severity that the claimant is not only unable to do his previous work, but cannot, considering

13  his age, education, and work experience, engage in any other kind of substantial, gainful work that

14  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

15          The regulations provide that the ALJ must undertake a specific five-step sequential analysis

16  in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the

17  claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).

18  If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment

19  or a combination of impairments significantly limiting him from performing basic work activities.

20  *Id.* §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the

21  claimant has a severe impairment or combination of impairments that meets or equals the

22  requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.  *Id.*

23  §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step, the ALJ must determine whether the claimant

24  has sufficient RFC despite the impairment or various limitations to perform his past work.  *Id.*

25  §§ 404.1520(f), 416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show

26  that the claimant can perform other work that exists in significant numbers in the national economy.

27  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in

28

                                        15

1   the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094,

2   1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

### V. DISCUSSION

**A.     The ALJ Did Not Err in Considering Evidence of Plaintiff's Mental Health Treatment**

Plaintiff contends that the ALJ failed to properly consider the opinions of Plaintiff's treating

mental health providers. (Doc. 18, 4:19-6:14.) Defendant asserts that the ALJ properly weighed the

evidence concerning Plaintiff's impairments and limitations. (Doc. 19, 11:16-14:6.)

**1.     Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security

cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat

the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

(nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of

doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater

weight than a non-examining physician's opinion. *Id.* Where a treating or examining physician's

opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing"

reasons for rejecting the treating physician's ultimate conclusions. *Id.* If the treating or examining

doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific

and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by

substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*,

574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and

thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof,

and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

**2.     The ALJ's Consideration of Plaintiff's Treating Medical Evidence**

Plaintiff contends that "[t]he reasons offered by the ALJ for discounting treating evidence

suggests a lack of acquaintance with bipolar disorder" and that the ALJ "ignores the nature of the

bipolar disorder" from which Plaintiff suffers. (Doc. 18, 5:9-13.) Accordingly, Plaintiff asserts that

the "ALJ has neither offered a legitimate conclusion [n]or a reason why he rejects the treating

16

opinions" and that "the hallmark of a bipolar disorder is that an individual will have good and bad days," thus "the ability of the treating physician to provide a dynamic and cinematic opinion" must be considered when determining Plaintiff's limitations.  (Doc. 18, 6:3-9.)

Plaintiff, however, fails to establish what opinions the ALJ purportedly rejected.  (*See* Doc. 18, 4:19-6:14.)  The ALJ considered the records from Fresno Mental Health and determined that they showed that Plaintiff was "in group sessions," "had good personal grooming," had "normal" speech and eye contact, "made good connections with other group members," was "functioning adequately," "was well groomed and neatly dressed," and "had developed techniques to increase her attention span."  (AR 18.)  The ALJ further found that the treatment notes indicated Plaintiff "was doing well on medications, which calmed her down, improved clarity in thinking, and facilities [sic] less anxiousness and depression."  (AR 18.)  Further, the ALJ found that Plaintiff "reported a decrease in symptoms and no side effects of the medicine."  (AR 18.)

The ALJ also considered a letter from Ms. Parraz, a licensed clinical social worker who indicated that she had been seeing Plaintiff since April 2008, while Plaintiff was under the care of Dr. Raypon.  (AR 18, *see also* AR 404-09.)  The ALJ acknowledged that Ms. Parraz' opinion is not a medical source opinion, but it is an opinion that the ALJ nonetheless recognizes.[8]  The ALJ found that "[t]he clear import and intent of Ms. Parraz' reporting is that she believes the claimant is not able to perform any jobs available in significant numbers in the national economy."  (AR 19.)  However, as the ALJ noted, this is "an issue reserved to the Commissioner."  (AR 19; *see also* Social Security Ruling 96-5p (finding that determination of whether an individual is disabled is an issue

---

[8] Medical sources are only considered to be opinions from licensed physicians (medical or osteopathic doctors), licensed or certified psychologists and, with certain limitations, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. §§ 404.1513(a)(1); 416.913(a)(1).  The Commissioner, however, may consider evidence from sources such as therapists and social workers when determining the severity of a claimant's impairment. 20 C.F.R. §§ 404.1513(a)(1); 416.913(d)(1); see also Social Security Ruling 06-03p ("information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function").  Ruling 06-03p further provides that opinions from other types of medical sources, "who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *Id.* at *3.

Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted.  20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding precedent upon ALJs.  *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

reserved to the Commissioner).  In any event, the ALJ gave Ms. Parraz' opinion "some weight," but determined that her ultimate conclusion "is not consistent with the evidence as a whole," which "shows that while the claimant does have some difficulties, she is not completely disabled." (AR 19.)

Plaintiff cites to no specific evidence that was rejected or ignored by the ALJ.  The cites offered by Plaintiff merely indicate a diagnosis of bipolar disorder.  (*See* Doc. 18, 6:17-19 (citing AR 243, 245, 247, 288, 289, 291, 298, 329, 330, 333, 335, 337, 346, 350, 355, 356, 359, 361, 364, 365, 366, 374, 376, 378, 385, 390, 391, 392, 396, 398, 401, 405-06).)  However, "[t]he mere existence of an impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  The same treatment notes cited to by Plaintiff also indicate that she had normal thought content (AR 288, 289, 291, 329, 330, 359, 366, 378, 392, 401), organized, relevant, and/or coherent thoughts (AR 288, 289, 291, 329, 330, 359, 366, 378, 392, 396, 401), normal cognition, speech, and orientation (AR 288, 289, 291, 329, 330, 359, 366, 378, 392, 396, 401), responded to medication (AR 289, 291, 329, 359, 378), reported that she was "doing al[l] right," (AR 291, 329, 359, 366), and that she was "less depressed" (AR 359, 378).  Additional treatment notes further indicate that the medication helped Plaintiff's condition (AR 261, 262, 263, 266, 291, 302, 304, 359, 378) and that she was doing well and/or had improved.  (AR 266, 280, 296, 297, 302, 359, 378).

Plaintiff appears to contend that the diagnoses of bipolar disorder, by itself, warrants a determination that she is disabled.  Citing to the Seventh Circuit case *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008), Plaintiff asserts that the ALJ's finding:

> suggest[s] a lack of acquaintance with bipolar disorder.  The fact that [Plaintiff] appears stable at times and is not a perpetual raving maniac is consistent with the impairment of bipolar disorder . . . . A person who has a chronic disease such as a bipolar disorder, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.  The impact of the worse days is what demonstrates she cannot hold down a full time job.

(Doc. 18, 5:12-19; *see also Bauer*, 532 F. 3d at 608-09.)  However, in *Bauer*, the ALJ "disregarded uncontradicted evidence" regarding Plaintiff's abilities and the findings from the plaintiff's treating physicians that she cannot hold down a full-time job.  *Bauer*, 532 F. 3d at 608-09.

Here, although Plaintiff asserts that the ALJ rejected the opinions of the treating physicians, she points to no specific evidence that was rejected or any finding by a treating physician regarding Plaintiff's ability to work.  (*See* Doc. 18, 4:19-6:14.)  Plaintiff merely cites portions of the administrative record that indicate that she was diagnosed with bipolar disorder.  (*See* Doc. 18, 5:4-6.)  However, Plaintiff must demonstrate that "such findings constitute significant or probative evidence that is not already accounted for in the ALJ's residual functional capacity assessment." *Williams v. Astrue*, No. EDCV 08-1378 JC, 2010 WL 147957, at *5 (C.D. Cal. Jan. 11, 2010); *see also Sample v. Schweiker*, 694 F.2d 639, 642-43 (9th Cir. 1982) ("The existence of emotional disorder, however, is not *per se* disabling . . . .  In addition, there must be proof of the impairment's disabling severity.") (citations omitted).  Plaintiff fails to indicate any specific treating records that the ALJ rejected or failed to consider.

Further, the ALJ relied upon the opinions of the examining physicians Dr. Damania and Dr. Michiel, to which he gave "substantial weight."  (AR 17, 19.)  The ALJ found that Dr. Damania determined that Plaintiff "could understand, carry out, and remember three- and four-step instructions in a work[-]like setting," "would have difficulty with complex and detailed job instructions, but could respond appropriately to coworkers, supervisors, and the public, "and would be "able to respond appropriately to usual work situations."  (AR 17, *see also* AR 309-10.) Likewise, the ALJ found that Dr. Michiel determined that Plaintiff is "able to maintain attention and concentration and carry out simple repetitive job instructions; she is able to relate and interact with coworkers, supervisors, and the general public while performing limited repetitive job instructions" but is "unable to carry out extensive variety of technical and/or complex instructions."  (AR 19; *see also* AR 411.)  An examining physician's "opinion alone constitutes substantial evidence, because it rests on his own independent examination." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  Further, Plaintiff points to no evidence submitted by the treating physicians that contradicts the findings of Dr. Damania and Dr. Michiel.  Accordingly, the ALJ properly considered the medical evidence in the record in forming his opinion and did not err in his consideration of the evidence concerning Plaintiff's mental treatment.

**B.   The ALJ's Determination of Plaintiff's Credibility**

Plaintiff contends that the ALJ improperly rejected her testimony concerning the episodic nature of her bipolar disorder.  (Doc. 18, 6:15-8:9.)  According to the Commissioner, however, the ALJ properly considered Plaintiff's subjective symptom testimony.  (Doc. 19, 14:7-15:19.)  In considering Plaintiff's credibility, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the [ALJ's] residual functional capacity assessment." (AR 19.)

**1.   Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.  *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.

1

2    **2.    The ALJ Provided Clear and Convincing Reasons for Rejecting Plaintiff's Subjective Complaints**

3        Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably

4    be expected to produce the alleged symptoms. (AR 19.)  Therefore, absent affirmative evidence of

5    malingering, the ALJ's reasons for rejecting Plaintiff's testimony must be clear and convincing.

6    *Vasquez*, 572 F.3d at 591.

7        The ALJ provided numerous reasons as to why he found Plaintiff "not credible" to the extent

8    that her described symptoms were "inconsistent" with the RFC determination.   (AR 19.)

9    Specifically, the ALJ found that Plaintiff was "inconsistent regarding her drug history." (AR 18.)

10   The ALJ noted that:

11       The claimant testified that her last illegal drug use was in May 2006 and her last use
         of opiates was in 2007; her last use of alcohol was around that time.  The claimant
12       testified that she never had a problem with alcohol and denies the statements . . . that
         she was drinking alcohol and wine 3 times a week.  The claimant stated that she had
13       no taste for alcohol.

14   (AR 15.)  The ALJ found Plaintiff's testimony concerning the lack of problems with alcohol use to

15   be inconsistent with the medical record:

16
         The claimant was twice hospitalized briefly in May 2005 because of suicidal ideation
17       . . . .  When admitted involuntarily on May 3, 2005, she had been drinking heavily
         . . . .  In addition, she apparently had been noncompliant with medication . . . .  The
18       claimant was discharged against medical advice because she could not be held longer
         against her will.  Diagnoses included alcohol dependence and methamphetamine
19       abuse.

20   (AR 16.)

21       The ALJ also found that Plaintiff "had been somewhat inconsistent about her substance abuse

22   [history] and about when she stopped using drugs and alcohol." (AR 16 (*compare* AR 266 (in

23   September 2005, Plaintiff claimed she had been clean since October 2004) *with* AR 271 (in June

24   2005, Plaintiff indicated she "used" methamphetamine "last week").) Further, Plaintiff had "credibly

25   testified that she previously used [illegal] drugs to self-medicate" and that "she had been self-

26   medicating with meth[amphetamine], as it helped calm her and stopped her racing thoughts." (AR

27   16.)

28

Inconsistent statements regarding drug use can be "substantial evidence in the record [to] support[] the ALJ's negative conclusions about [the plaintiff's] veracity." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's testimony is believable. *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999). "In determining credibility, an ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005); *see also Thomas*, 278 F.3d at 959 (supporting the ALJ's finding that a "lack of candor" regarding the use of drugs "carries over" to the plaintiff's description of her disabling condition). Accordingly, the ALJ made a clear and convincing determination that Plaintiff's inconsistent statements impacted her credibility.

Likewise, the ALJ found that Plaintiff "identified numerous activities of daily living which seem inconsistent with the disabling conditions she alleged." (AR 17.) The ALJ noted that Plaintiff reported during her treatment that she was "planning to attend City College and told her doctor she was looking for work. She was also trying to obtain custody of her eight-year-old son." (AR 16.) The ALJ further noted that:

> Regarding activities of daily living, the claimant related that she typically wakes up, eats, watches television, and then wanders around the house, might go outside, might pull weeds. Furthermore, she indicated that she tries to help her mother with household chores like laundry, vacuuming, and cleaning up after herself. She tries to attend church when she can, but usually sits in a side chapel to keep from disrupting others.

(AR 17.)

An ALJ can appropriately consider Plaintiff's activities of daily living in determining that she was not entirely credible, but the mere fact of a claimant's carrying on certain daily activities does not necessarily detract from credibility as to overall disability. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). However, a negative inference is permissible where the activities contradict the other testimony of the claimant, or where the activities are of a nature and extent to reflect transferable work skills. *See Thomas*, 278 F.3d at 958-59; *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) A claimant's performance of chores such as preparing meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has been

1    considered sufficient to support an adverse credibility finding when performed for a substantial

2    portion of the day. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *Burch*,

3    400 F.3d at 680-81; *Thomas*, 278 F.3d at 959; *Morgan*, 169 F.3d at 600; *Curry v. Sullivan*, 925 F.2d

4    1127, 1130 (9th Cir. 1990).

5         Finally, Plaintiff does not refute any of the ALJ's findings but instead contends that the ALJ

6    committed legal error by not considering Plaintiff's descriptions of the episodic nature of her bipolar

7    disorder. (Doc. 18, 6:15-17.) Plaintiff does not indicate what *specific* evidence the ALJ disregarded.

8    (*See* Doc. 18, 6:15-8:9.)  Instead, Plaintiff points to the same medical treatment records, discussed

9    above, that purportedly supported her argument that the ALJ failed to properly consider Plaintiff's

10   mental health treatment. (*See* Doc. 18, 6:17-19.)  Plaintiff's assertion, however, is not supported by

11   this evidence for the same reasons as discussed above: the cited medical records merely establish

12   Plaintiff has a diagnosis of bipolar disorder but "[t]he mere existence of an impairment is insufficient

13   proof of a disability." *Matthews,* 10 F.3d at 680.  Plaintiff also asserts the ALJ did not properly

14   consider her testimony at the administrative hearing, but again fails to indicate what testimony,

15   *specifically*, the ALJ did not consider or how he erred in his determination regarding inconsistencies

16   in Plaintiff's statements. (Doc. 18, 6:19-23.)

17        "Where, as here, the ALJ has made specific findings justifying a decision to disbelieve an

18   allegation . . . and those findings are supported by substantial evidence in the record, our role is not

19   to second-guess that decision." *Morgan*, 169 F. 3d at 600 (citation omitted).  As the ALJ's reasons

20   were properly supported by the record and sufficiently specific, the Court must thus conclude that

21   the ALJ rejected Plaintiff's testimony on permissible grounds and did not arbitrarily discredit

22   Plaintiff's testimony. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).

23                          **VI.  CONCLUSION**

24        Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

25   evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court

26   DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.

27   //

28   //

The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Angela L. Vasquez.


IT IS SO ORDERED.

**Dated:    September 23, 2012**                          /s/ Sheila K. Oberto
                                                 UNITED STATES MAGISTRATE JUDGE